IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2024 Term

_____

No. 22-0340
_____

FILED

June 5, 2024

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

POTOMAC COMPREHENSIVE DIAGNOSTIC & GUIDANCE CENTER, INC.,
AKA POTOMAC CENTER, INC.,
Defendant Below, Petitioner,

v.

L.K., BY HER GUARDIAN AND CONSERVATOR, KELLY YOUNG, AND
D.S., BY HIS GUARDIAN AND CONSERVATOR, KELLY YOUNG,
Plaintiffs Below, Respondents.
_____

Appeal from the Circuit Court of Hardy County
Honorable C. Carter Williams, Judge
Civil Action No. 2020-C-13

REVERSED AND REMANDED
_____

Submitted: April 17, 2024
Filed: June 5, 2024

Charles R. Bailey, Esq.
David J. Mincer, Esq.
Adam K. Strider, Esq.
Bailey & Wyant, PLLC
Charleston, West Virginia
Attorneys for Petitioner

Jonathan Marshall, Esq.
Sharon F. Iskra, Esq.
Victor S. Woods, Esq.
Samuel A. Hrko, Esq.
Bailey and Glasser, LLP
Charleston, West Virginia
and
Deepak Gupta, Esq.
Robert Friedman, Esq.
Gupta Wessler PLLC
Washington, D.C.
Attorneys for Respondents

JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE WOOTON concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

**SYLLABUS BY THE COURT**

1.      ""A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992)." Syl. Pt. 1, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995).

2.      "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976).

3.      "W. Va. Code § 5-11-9(7)(A) (1998) (2006) of the West Virginia Human Rights Act establishes three distinct causes of action. More specifically, pursuant to W. Va. Code § 5-11-9(7)(A), unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions, it is an unlawful discriminatory practice for any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution to: (1) engage in any

i

form of threats or reprisal, or (2) engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss, or (3) aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices defined in W. Va. Code § 5-11-9." Syl. Pt. 5, *Michael v. Appalachian Heating, LLC*, 226 W. Va. 394, 701 S.E.2d 116 (2010).

4.     "'The West Virginia Rules of Evidence . . . allocate significant discretion to the trial court in making evidentiary . . . rulings.  Thus, rulings on the admission of evidence . . .  are committed to the discretion of the trial court.  Absent a few exceptions, this Court will review evidentiary . . . rulings of the circuit court under an abuse of discretion standard.' Syl. Pt. 1, in part, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995)."  Syl. Pt. 9, *Tudor v. Charleston Area Med. Ctr., Inc.*, 203 W. Va. 111, 506 S.E.2d 554 (1997).

5.     "Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the [exhibit] is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." Syl. Pt. 10*, State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

6.     "Although Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence."  Syl. Pt. 9*, State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

7.     "Before evidence may be admitted under W. Va. R. Evid. 803(6), the proponent must demonstrate that such evidence is (1) a memorandum, report, record, or data compilation, in any form; (2) concerning acts, events, conditions, opinions or diagnoses; (3) made at or near the time of the matters set forth; (4) by, or from information transmitted by, a person with knowledge of those matters; (5) that the record was kept in the course of a regularly conducted activity; and (6) that it was made by the regularly conducted activity as a regular practice."  Syl. Pt. 7, *Lacy v. CSX Transp. Inc.,* 205 W. Va. 630, 520 S.E.2d 418 (1999), *superseded by rule on other grounds as stated in Miller v. Allman*, 240 W. Va. 438, 813 S.E.2d 91 (2018).

8.     "The trial court has an obligation to all parties to ensure that the trial is conducted in a fair manner."  Syl. Pt. 3, in part, *State v. Delorenzo*, 247 W. Va. 707, 885 S.E.2d 645 (2022).

**HUTCHISON, Justice:**

The petitioner and defendant below, Potomac Comprehensive Diagnostic & Guidance Center, Inc., also known as Potomac Center, Inc. ("Potomac"), appeals the April 1, 2022, order of the Circuit Court of Hardy County denying its motion for a new trial and judgment notwithstanding the verdict and its alternative motion to alter or amend judgment after a jury rendered a verdict in favor of the respondents and plaintiffs below, L.K.[1] and D.S., by and through their guardian and conservator, Kelly Young (collectively "plaintiffs"). The plaintiffs alleged that they were abused and neglected by Potomac staff members while residing at the facility for approximately five months spanning the years 2013 and 2014. They asserted claims for negligence and unlawful discrimination in violation of the West Virginia Human Rights Act.[2]

In this appeal, Potomac asserts that the circuit court erred by: (1) denying its pre-trial motion for summary judgment on the issue of whether Potomac is a "place of public accommodations" under the Human Rights Act; (2) failing to dismiss the claim that Potomac violated the Human Rights Act by creating a hostile environment for its residents; (3) admitting evidence at trial pertaining to the abuse of other children who resided at

---

[1] We use initials instead of full names to protect the identities of the juveniles involved in this case. *See* W. Va. R. App. Proc. 40(e).

[2] *See* W. Va. Code §§ 5-11-1 to -20. Effective February 8, 2024, the Human Rights Act was repealed and reenacted as West Virginia Code §§ 16B-17-1 to -20. However, all references herein are to the former codification as it was in effect during the proceedings below.

1

Potomac and the results of a 2014 investigation of that abuse; (4) allowing an expert witness to testify that L.K. and D.S. were abused while they resided at Potomac; and (5) instructing the jury regarding knowledge imputed to an employer. Potomac further contends that the above errors constituted cumulative error; the amount of the jury's verdict was not supported by the evidence; and the jury's award of significant damages for pain and suffering was an improper attempt to award punitive damages. Upon consideration of the parties' briefs and oral arguments, the submitted appendix record, and pertinent authorities, we find that Potomac is not a "place of public accommodations" under the Human Rights Act and that the circuit court erred by not granting summary judgment to Potomac on this issue prior to trial. We further find that the circuit court committed reversible error by admitting the 2014 investigative reports in their entirety into evidence at trial. Accordingly, we reverse the circuit court's final order and remand this case for a new trial.

## I. Facts and Procedural Background

Potomac is a residential behavioral health center located in Romney, West Virginia, that was established in 1980 with the goal of teaching its patients skills to maximize their potential for self-care and independent living while reducing their negative behaviors. At the time of the events that led to the filing of this civil action, Potomac accommodated twenty-four children ranging in age from seven years to nineteen years old who were diagnosed with developmental, intellectual, and/or behavioral disorders. Many of the children residing at Potomac were autistic and had violent personality or behavioral

conditions. Nine of the children were nonverbal or nonverbal by definition, meaning they had limited communication skills. The children were placed in one of three houses, known as "A House," "B House," and "C House" based on their physical age, developmental age, and abilities. The youngest children were in "A House," while the oldest resided in "C House."

L.K. was a resident at Potomac from June 24, 2013, to December 10, 2013. She was fourteen years old when she entered Potomac and was initially placed in "B House" based on her physical age but was moved to "A House" when a bed became available. L.K. was referred to Potomac by the West Virginia Department of Health and Human Resources ("DHHR")[3] after she was removed from the care and custody of her mother during an abuse and neglect proceeding. L.K. has severe autism and a pervasive developmental disorder. She is considered nonverbal.

D.S. resided at Potomac from August 1, 2013, to January 17, 2014. D.S. has severe autism, developmental delay learning difficulties, attention deficit hyperactivity disorder, and intermittent explosive disorder. He is also nonverbal. D.S. was nine years

---

[3] Pursuant to West Virginia Code § 5F-2-1a (2024), the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2 (2024). We continue to refer to the DHHR in this opinion, however, because that was the agency in existence during the proceedings below.

old when he entered Potomac but was functioning at a two-year-old level and was placed in "A House." D.S. had also been removed from his mother's custody as a result of an abuse and neglect proceeding and, thus, was referred to Potomac by the DHHR.

In January 2014, Lori Glover, an investigator for the Institutional Investigative Unit of the DHHR began an investigation at Potomac after a newly hired staff member reported an incident of abuse of a child by another staff member. It was alleged that a staff member had intentionally sprayed a child in the face with a shower nozzle while forcibly restraining the child on the floor with his foot.[4] Upon further investigation, Ms. Glover learned of other alleged incidents of abuse and neglect of children residing at Potomac by staff members. She related an overview of the allegations in her investigative "IIU-Short Report"[5] as follows:

> During the course of a routine investigation, numerous staff began making accusations towards each other and their superiors. This has included such things as a status quo of "roughness" and violence against children in behaviors, punches and slaps to the back of children's heads, strikes to a child's chest, hair pulling, bending (milking) digits (fingers and toes), bending wrists or ankles, choke holds, sleeper holds, hit or kicks to testicles, throwing children down to hit or kick them, purposely giving children a cold shower, hanging a resident by his gait belt from a shower rod for staff's

---

[4] This child was neither L.K., nor D.S.

[5] Ms. Glover also authored a lengthier investigative report, referred to as the "IIU-Long Report," that contained detailed accounts of the statements made by all persons interviewed as part of her investigation, which included Potomac staff members, children, and parents. As discussed herein, both of Ms. Glover's reports were admitted into evidence at trial as exhibits of the plaintiffs.

4

entertainment, restraining a child by securing the back of his helmet to a wall, sexual touch of a female child, blow jobs to a male child, pulling heads back too far with a forearm in the back of their neck, Snap Chat videos and pictures that were inappropriate and/or labeling them "tard." Malicious tampering with hygiene products (pee in shampoo bottle, toothbrush in toilet). Maliciously tripping kids, a detailed incident over a radio in which a child was shoved 6 ft striking into a wall, hit off the floor [sic] and choked to the point of turning purple, fishhooks (pulling child's cheek out by inserting finger in mouth to mimic a fishhook). Failure to report incidents of abuse, numerous licensing violations, etc.

During her investigation, Ms. Glover substantiated some, but not all, of these allegations. The West Virginia State Police and the Institutional Investigative Unit of the Office of Health Facility Licensure and Certification of the Bureau for Children and Families (hereinafter "OHFLAC") were notified of the allegations, and these agencies conducted simultaneous investigations.[6] As a result, the children residing at Potomac in January 2014, including D.S., were removed from the facility, and it was closed for several months.

At the end of her three-month investigation, Ms. Glover concluded that eight staff members had abused and neglected children residing at Potomac. Four Potomac staff

---

[6] While DHHR investigated the allegations of abuse and neglect, OHFLAC, the licensing agency, determined which state regulations were violated as a result of the misconduct. Like DHHR, OHFLAC generated two reports, one titled "Preliminary Summary of Findings of Non-Compliance" and a second titled "Licensure Summary of Findings of Non-Compliance and Plan of Correction." OHFLAC's two reports were also admitted into evidence at trial as exhibits of the plaintiffs.

5

members were criminally charged with various felony offenses including child neglect causing injury, child abuse causing injury, and conspiracy.[7] These four staff members entered into plea agreements with the State, and three of them received prison sentences. In her "IIU-Short Report," Ms. Glover concluded:

> Due to the children's limitations not all instances of abuse could be fully investigated. However, it appears that staff, particularly in B and C Houses, were routinely using abusive methods to control children and/or entertain themselves. This include[d]: aggressive horseplay, wrestling holds (head locks, sleeper holds, figure fours, haymakers, body slams, fish hooks, etc.), pokes, hits, shoves, hair pulls, punches, milking of digits, twisting of wrists/ankles, and kicks. It also appears that verbal abuse in the form of threats, bribes, coercion, insults, ridicule, etc., were commonplace. There were also several allegations of sexual abuse ranging from fondling, viewing pornographic materials, watching inappropriate television and/or movies, and being privy to staff's sexualized behaviors, conversations, and innuendoes. Children were taken or lured to "blind spots" for the purpose of abusive acts. It was further determined that children across the campus had been exposed to inappropriate discipline such as cold showers, excessive and/or inappropriate use of time out chair, consequence for improper reasons, and had several consequences for the same offense.

The plaintiffs initiated this civil action in the Circuit Court of Kanawha County in September 2017, and they filed their "First Amended Complaint" on January 19, 2018. That complaint alleged that the plaintiffs were victims of abuse and neglect while they resided at Potomac and that neither had received the services that Potomac claimed to

---

[7] The other four staff members were charged with failure to report an incident of child abuse, which is a misdemeanor. Neither L.K. nor D.S. were alleged to be a victim of any of the criminal offenses committed by the Potomac staff members.

6

provide to its patients.  Count one of the complaint alleged violations of the West Virginia Human Rights Act, asserting that Potomac is a "place of public accommodations" and that Potomac had committed unlawful discrimination on the basis of disability.  Count two alleged a violation of the West Virginia Consumer Credit and Protection Act, contending that Potomac had made material misrepresentations regarding the services it provides.[8] Count three alleged "negligent failure to hire, train and supervise," while count four asserted general negligence.  After extensive discovery, the case was transferred to the Circuit Court of Hampshire County[9] and then to the Circuit Court of Hardy County[10] where trial commenced on May 10, 2021.

Prior to trial, Potomac filed a motion for partial summary judgment arguing that was not subject to a claim under the Human Rights Act because it is not a "place of public accommodations" as defined therein.  A hearing was held on April 20, 2021, and the circuit court took the matter under advisement but allowed for additional briefing.  The motion was eventually denied.

---

[8] The plaintiffs withdrew this claim prior to trial.

[9] The Circuit Court of Kanawha County transferred the case, sua sponte, to the Circuit Court of Hampshire County on June 6, 2019.

[10] The Circuit Court of Hampshire County granted Potomac's motion for transfer of venue on April 14, 2020, sending the case to Hardy County.

The trial lasted five days. The jury heard testimony from numerous witnesses, and voluminous exhibits were introduced as evidence. Testimony was provided by the plaintiffs' mothers and treating physicians regarding the plaintiffs' conditions before and after they resided at Potomac. Both sides had experts evaluate L.K. and D.S., and these experts testified at trial and relayed their findings to the jury. In addition, several witnesses testified about the 2014 investigation of Potomac by the DHHR, OHFLAC, and the State Police. The jury learned of all the allegations of abuse and neglect investigated by these agencies and that certain staff members were criminally prosecuted and convicted of committing offenses against children that resided at Potomac, but not L.K. or D.S. Some Potomac staff members also testified.

At the end of trial, the parties agreed on a joint jury charge and verdict form. The verdict form required the jury to make specific findings as to whether Potomac was (1) negligent; (2) allowed or created an environment that was severely hostile to its child residents based on their disabilities and thereby harmed the plaintiffs; and/or (3) refused, denied, or failed to provide the services or advantages of its programs to the plaintiffs. The jury returned a mixed verdict, finding that Potomac was negligent and had allowed or created a hostile environment for its residents but had not refused, denied, or failed to provide services or advantages of its programs to the plaintiffs. If any findings were made in favor of the plaintiffs, the verdict form directed the jury to designate the amount of damages, if any, to fairly compensate each plaintiff separately. The jury awarded L.K. $500,000 for past physical pain and suffering and $500,000 for past emotional distress,

8

limitation, and loss of enjoyment of life. The jury awarded D.S. $1,250,000 for past physical pain and suffering and $1,250,000 for past emotional distress, limitation, and loss of enjoyment of life. The jury did not award any damages to either plaintiff for future care and medical treatment or for future emotional distress, limitation, and loss of enjoyment of life.

After the jury rendered its verdict, Potomac filed a motion for a new trial and judgment notwithstanding the verdict and an alternative motion to alter or amend judgment. Potomac requested a new trial on the plaintiffs' negligence claim and judgment notwithstanding the verdict on the plaintiffs' hostile environment claim. Potomac also argued that a new trial was warranted because the damages verdict was not supported by the evidence and that at a minimum, the court should enter a remittitur of the jury's verdict pursuant to Rule 59(e) of the West Virginia Rules of Civil Procedure. These motions were denied by the circuit court by the order entered on April 1, 2022. This appeal followed.

## II. Standard of Review

In this appeal, Potomac first argues that the circuit court erred by denying its motion for partial summary judgment prior to trial. This Court has long held that "'"[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1,

9

*Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992)." Syl. Pt. 1, *Williams v. Precision Coil, Inc.,* 194 W. Va. 52, 459 S.E.2d 329 (1995). We review a circuit court's ruling on a motion for summary judgment de novo. Syl. Pt. 1, *Painter v Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

Potomac also challenges the circuit court's decision to deny its motion for a new trial. In relevant part, Rule 59(a) of the West Virginia Rules of Civil Procedure provides that "[a] new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law[.]" This Court has held that,

> [a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syl. Pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976). We have further explained:

> "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review." Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

*Jordan v. Jenkins,* 245 W. Va. 532, 545, 859 S.E.2d 700, 713 (2021).

10

Because of the nature of the assigned errors, additional standards of review apply to specific issues. We set forth those standards where applicable in the discussion below. Accordingly, we proceed to address Potomac's assignments of error.

### III.  Discussion

For purposes of our analysis, we separate Potomac's assignments of error into three categories:  Human Rights Act claims, evidentiary error, and damages.  Because we find merit to alleged errors relating to the Human Rights Act and the admission of certain evidence at trial, we must reverse the circuit court's final order and remand this case for a new trial.  Consequently, we need not address Potomac's arguments relating to the damages awarded by the jury.

### A.  *Human Rights Act claims*

We begin our analysis by addressing the first two assignments of error, which pertain to the plaintiffs' claim that Potomac committed unlawful discrimination in violation of the Human Rights Act. The plaintiffs alleged that Potomac violated the Human Rights Act in two ways: (1) by refusing, withholding, and/or failing to provide them the services or advantages of its programs because of their disabilities and, (2) by allowing or creating an environment that was severely or pervasively hostile to the children residing there based on their disabilities.  Potomac first argues that it is not subject to a claim under the Human Rights Act because it is not a "place of public accommodations," and, therefore, the circuit court erred by not granting its motion for summary judgment on this issue prior to trial.

11

Potomac further argues that under the Human Rights Act, there is no discrimination claim

based on a "hostile environment" in a place of public accommodations and thus, the circuit

court further erred by allowing this claim to be presented to the jury.

### 1. *Place of Public Accommodations*

The Human Rights Act provides, in pertinent part:

> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the State of West Virginia or its agencies or political subdivisions:
>                . . . .
> (6) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any *place of public accommodations* to:
>
> (A) Refuse, withhold from or deny to any individual because of his or her race, religion, color, national origin, ancestry, sex, age, blindness or disability, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of the place of public accommodations[.]

W. Va. Code § 5-11-9(6)(A) (1998) (emphasis added). Under the Human Rights Act, a

"place of public accommodations" is

> any establishment or person, as defined herein, including the state, or any political or civil subdivision thereof, which offers its services, goods, facilities or accommodations to the general public, but shall not include any accommodations which are in their nature private.

W. Va. Code § 5-11-3(j) (1998). The term "person" is defined to "mean[] one or more

individuals, partnerships, associations, organizations, corporations, labor organizations,

12

cooperatives, legal representatives, trustees, trustees in bankruptcy, receivers, and other organized groups of persons[.]" W. Va. Code § 5-11-3(a) (1998).

Potomac argues it is not a "place of public accommodations" because it only accepts referrals for residential care of children who are certified as meeting particularized qualifications and is not open to the public like a hotel, bus service, or restaurant. In support of its argument, Potomac relies upon *Skaff v. West Virginia Human Rights Commission*, 191 W. Va. 161, 444 S.E.2d 39 (1994), a case in which this Court was tasked with determining whether the State's penal institutions are "places of public accommodations" such that prisoners housed therein could assert claims under the Human Rights Act. In finding that our penal institutions do not fall within the definition of "place of public accommodations," this Court concluded that "one of the essential ingredients of a place of public accommodations [i]s that the facility allows participation of unscreened and unselected members of the public." *Skaff*, 191 W. Va. at 163, 444 S.E.2d at 41. In other words, "a place of public accommodations must be open to members of the public." *Id*. Potomac maintains that it is not open to members of the public as contemplated by the Human Rights Act.

Conversely, the plaintiffs argue that the circuit court correctly ruled that Potomac is a "place of public accommodations" because it was legislatively created, operates pursuant to the laws of this State, and receives public funding. To support their position, the plaintiffs rely upon *Shepherdstown Volunteer Fire Department. v. State ex*

13

*rel. State of West Virginia Human Rights Commission*, 172 W. Va. 627, 309 S.E.2d 342 (1983)*, a case wherein it was determined that two fire departments engaged in unlawful discrimination when they denied membership to women applicants. In answering the threshold question of whether the volunteer fire departments were "places of public accommodations," this Court considered the fact that the volunteer fire departments were created and regulated by statute and dependent upon extensive public funding. Accordingly, this Court concluded that:

> A volunteer fire department, organized and operated pursuant to the laws of the State of West Virginia, and which receives funding from public sources, is a "place of public accommodations" as defined by *W.Va.Code*, 5–11–3(j) [1981], and is thereby subject to the provisions of The West Virginia Human Rights Act, as amended, *W.Va.Code*, 5–11–1 *et seq*.

*Shepherdstown Volunteer Fire Dep't*, 172 W. Va. at 628, 309 S.E.2d at 343, syl. pt. 1.

The plaintiffs also point to *Israel by Israel v. West Virginia Secondary Schools Activities Commission*, 182 W. Va. 454, 388 S.E.2d 480 (1989), wherein this Court found that the Secondary Schools Activity Commission ("SSAC") is a "place of public accommodations" subject to the Human Rights Act. The plaintiffs highlight that in *Israel*, this Court expressly rejected the SSAC's claim that "because the general public does not participate in interscholastic sports and because it does not operate any facility that is open to the public, it does not fall within the public accommodations definition." *Id.* at 463, 388 S.E.2d at 489. The plaintiffs argue that in both the *Shepherdstown Volunteer Fire Department* and *Israel* cases, the controlling factors were whether the subject entity was

14

(1) created and operated pursuant to the laws of this State and (2) received funding from public sources. The plaintiffs maintain that because Potomac satisfies these two factors, the circuit court did not err in finding that Potomac is a "place of public accommodations" under the Human Rights Act. We disagree.

We do not read the *Shepherdstown Volunteer Fire Department and Israel* decisions as narrowly as the plaintiffs. If being subject to statutory regulation and public funding were the only two factors to be considered, then this Court would have reached a different result in *Skaff* as our penal institutions clearly satisfy those criteria. Instead, the critical distinction is that "a place of public accommodations" must be open to the public or serve the public. *Id.* at 163, 444 S.E.2d at 41. Indeed, in *Shepherdstown Volunteer Fire Department,* it was the fact that volunteer fire departments provided services to the general public that caused this Court to find that they were places of public accommodations. *Id.* at 636, 309 S.E.2d at 351. Likewise, in *Israel*, "the critical point" was "that the SSAC regulates interscholastic athletes and its membership, all of which have a direct impact on the public school system." *Id.* at 463, 388 S.E.2d at 489. In contrast, in *Skaff,* this Court found that "because members of the general public are excluded [from penal institutions], the inmates' place of confinement cannot be deemed a public accommodation. There is no unscreened or unselected membership that is able to utilize the facility[.]" *Id.* at 163-64, 444 S.E.2d at 41-42. We find the same to be true with respect to Potomac. Potomac is a residential facility that only admits developmentally disabled children who satisfy certain criteria. It is not open to the public, nor does it provide services to the general public. No

15

unscreened or unselected child may be placed at Potomac.[11]  We, therefore, conclude that Potomac is not a "place of public accommodations" and that the circuit court erred by denying summary judgment to Potomac on this issue prior to trial.

## 2.  *Hostile Environment claim*

Potomac next argues that the circuit court erred by failing to dismiss the plaintiffs' claim under the Human Rights Act based upon a hostile environment.  Potomac contends this claim was not proper because this Court has never recognized such a cause of action in the context of a claim asserted against a "place of public accommodations." The plaintiffs counter that their hostile environment claim was not asserted under West Virginia Code § 5-11-9(6) (the public accommodations provision) but rather under West Virginia Code § 5-11-9(7).  This latter subsection provides that it is unlawful discrimination

> [f]or *any person*, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution to:
>
> (A) Engage in any form of threats or reprisal, or to engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss or to aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices defined in this section[.]

---

[11] We recognize that private placement occurs at Potomac, but all children who reside there must satisfy the selection and screening requirements.

W. Va. Code § 5-11-9(7) (emphasis added).

Potomac asserts that the plaintiffs failed to give proper notice of a hostile environment claim under West Virginia Code § 5-11-9(7). According to Potomac, this was a "late-disclosed alternate theory" of liability under the Human Rights Act that never appeared in the plaintiffs' First Amended Complaint, which is the governing pleading. Potomac argues that a broad general reference to the Human Rights Act in the complaint with only a specific allegation that Potomac is a "place of public accommodations" was not sufficient to put it on notice of the plaintiffs' hostile environment claim. We disagree.

The Rules of Civil Procedure require that pleadings be liberally construed "as to do substantial justice." W. Va. R. Civ. Proc. 8(f); *see also Mountaineer Fire & Rescue Equipment, LLC v. City National Bank of WV,* 244 W. Va. 508, 520, 854 S.E.2d 870, 882 (2020) ("We "liberally construe pleadings so 'as to do substantial justice.'"). To that end, "a plaintiff pleading a claim for relief need only give general notice as to the nature of his or her claim." *Gable v. Gable*, 245 W. Va. 213, 221, 858 S.E.2d 838, 846 (2021) (additional citation omitted). Indeed, as we have explained, "the West Virginia Rules of Civil Procedure reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and manifest a preference for the resolution of disputes on the merits, not on technicalities of pleading." *Id.*

Here, the complaint made clear that the plaintiffs were asserting that Potomac "through [its] acts and omissions [as] described . . . committed unlawful discrimination on the basis of disability, in violation of the West Virginia Human Rights Act," citing West Virginia Code § 5-11-9. In addition, the complaint alleged instances of "ridicule" of children and violence against children, and further asserted that "almost every child expressed fear of Potomac Center staff members." Accordingly, we find that the complaint gave Potomac sufficient notice that plaintiffs were asserting a claim under the Human Rights Act based upon a hostile environment.

We further find that the plaintiffs' hostile environment claim comes within the parameters of West Virginia Code § 5-11-9(7). This Court previously examined this provision of the Human Rights Act in *Michael v. Appalachian Heating, LLC,* 226 W. Va. 394, 701 S.E.2d 116 (2010), and determined that it establishes three distinct causes of action under the Human Rights Act. In that regard, this Court held:

> W. Va. Code § 5-11-9(7)(A) (1998) (2006) of the West Virginia Human Rights Act establishes three distinct causes of action. More specifically, pursuant to W. Va. Code § 5-11-9(7)(A), unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions, it is an unlawful discriminatory practice for any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution to: (1) engage in any form of threats or reprisal, or; (2) engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss, or (3) aid, abet, incite,

18

compel or coerce any person to engage in any of the unlawful discriminatory practices defined in W. Va. Code § 5-11-9.

*Appalachian Heating*, 226 W. Va. at 395, 701 S.E.2d at 117, syl. pt. 5.

In *Appalachian Heating,* this Court was asked to determine, by way of certified question, whether a Human Rights Act claim could be brought by African American tenants of an apartment building against the insurer of a contractor whose alleged negligence in the repair and replacement of climate control units caused a fire resulting in the total loss of the tenants' personal property. *Id.* at 398, 701 S.E.2d at 120. The tenants alleged that the insurance company committed unlawful discrimination in violation of the Human Rights Act in settling their property damages claims. However, the insurance company argued that the tenants' claims were barred by the West Virginia Unfair Trade Practices Act, which prohibits a third-party lawsuit against an insurer. *Appalachian Heating,* 226 W. Va. at 397-98, 701 S.E.2d at 119-20. This Court determined that the Human Rights Act and the Unfair Trade Practices Act "seek to remedy different harms" and thus, there was no conflict between them. *Appalachian Heating*, 226 W. Va. at 403, 701 S.E.2d at 125. This Court then found that the tenants' claims fell squarely with the Human Rights Act as they were asserting that the insurance company failed to fairly investigate and settle their property damages claims because of their race. *Appalachian Heating*, 226 W. Va. at 403-04, 701 S.E.2d at 125-26. In that regard, it was noted that,

> to be covered under the Human Rights Act, prohibited actions must be perpetrated against a member of one of the specific protected classes identified therein. Although W. Va. Code § 5-11-9(7)(A) does not expressly state that it applies

19

only to members of a protected class, this limitation is understood because W. Va. Code § 5-11-9 expressly proscribes "unlawful *discriminatory* practices." (Emphasis added). The meaning ascribed to the term "discriminate" or "discrimination" by the Human Rights Act is "to exclude from, or fail or refuse to extend to, a person equal opportunities *because of race, religion, color, national origin, ancestry, sex, age, blindness, disability or familial status* and includes to separate or segregate." W. Va. Code § 5-11-3(h) (1998) (Repl.Vol.2006) (emphasis added).

*Appalachian Heating,* 226 W. Va. at 402 n.16, 701 S.E.2d at 124 n.16.

This Court concluded in *Appalachian Heating* that the tenants' claims could be asserted under West Virginia Code § 5-11(9)(7) against the insurance company because "as an 'organization' or 'corporation,'" it fell within the meaning of the term "person" as defined by the Human Rights Act. *Appalachian Heating*, 226 W. Va. at 402, 701 S.E.2d at 124. The same is true with respect to Potomac. While we have found that Potomac is not a "place of public accommodations" under West Virginia Code § 5-11-3(j), it clearly comes within the plainly worded definition of "person" set forth in West Virginia Code § 5-11-3(a).

Additionally, looking at the conduct prohibited by West Virginia Code § 5-11-9(7)(A), it was determined in *Appalachian Heating* that the acts of discriminatory conduct alleged by the tenants if proven would constitute a violation of the Human Rights Act because "West Virginia Code § 5-11-9(7)(A) prohibits a 'person' from engaging in 'acts or activities *of any nature*, the purpose of which is to harass, degrade, embarrass or

20

*cause* physical harm or *economic loss* [to]' a member of a protected class." *Appalachian Heating*, 226 W. Va. at 402, 701 S.E.2d at 124. Likewise, in the instant case, the discriminatory conduct alleged—that Potomac allowed or created an environment that was severely or pervasively hostile to its child residents based on their disabilities—clearly comes within the conduct prohibited by West Virginia Code § 5-11-9(7)(A). Therefore, the circuit court did not err in allowing the plaintiffs' hostile environment claim to be presented to the jury.[12]

## B. Evidentiary Error

Potomac next argues that the circuit court committed reversible error by denying its motions in limine to exclude the admission of certain evidence at trial, specifically (1) the 2014 investigative reports containing the allegations regarding the abuse of children other than the plaintiffs and the results and procedures of the investigations, and (2) expert testimony that the plaintiffs were abused and neglected while they resided at Potomac. Potomac also asks us to find that the circuit court plainly erred

---

[12] Potomac also argues that even if the plaintiffs have a claim under West Virginia Code § 5-11-9(7)(A), they presented insufficient evidence at trial to support the jury's verdict in their favor. Because we find *infra* that the improper admission of certain evidence requires us to remand this case for a new trial, we do not address this issue because the evidence presented at the next trial may be different. *See Morrison v. Sharma*, 200 W. Va. 192, 196, 488 S.E.2d 467, 471 (1997) (explaining that evaluating the evidence in the prior trial "would be meaningless since we cannot say that plaintiff will again present its case in the same way or with the same testimony" (additional quotations and citation omitted)).

when it instructed the jury regarding knowledge that can be imputed to an employer. Finally, Potomac contends that even if these errors individually are not significant, cumulatively, they warrant a new trial. *See* Syl. Pt. 8, *Tennant v. Marion Health Care Foundation, Inc.*, 194 W. Va. 97, 459 S.E.2d 374 (1995) ("The cumulative error doctrine may be applied in a civil case when it is apparent that justice requires a reversal of a judgment because the presence of several seemingly inconsequential errors has made any resulting judgment inherently unreliable."). We do not need to consider applying the cumulative error doctrine here, because as explained below, we find that the circuit court committed reversible error when it allowed the reports pertaining to the 2014 investigations into the alleged abuse of other children at Potomac to be admitted into evidence at trial in their entirety.[13]

Prior to trial, the plaintiffs argued, and the circuit court agreed, that the investigative reports were relevant to both the negligence and Human Rights Act claims. Regarding the latter, the plaintiffs asserted that the evidence was necessary to establish that they were exposed to a hostile environment. In this appeal, Potomac argues that the evidence was irrelevant to the plaintiffs' negligence and hostile environment claims because there was no indication that either L.K. or D.S. were present when any of the abuse involving the other children occurred. In other words, Potomac contends that absent any

---

[13] The reports at issue were those prepared by the DHHR and OHFLAC. The plaintiffs did not offer the State Police investigative report as an exhibit at trial.

evidence that the plaintiffs were present, the alleged incidents involving other children could not have contributed to the hostile environment to which L.K. and D.S. were allegedly exposed. Potomac further argues that even if relevant, the reports contained inadmissible hearsay accounts, sometimes double and triple in nature, in the form of someone saying they "heard of" a child being mistreated. These accounts do not identify the child(ren), the alleged abuser(s), or when the alleged event(s) occurred. Moreover, most of these allegations were never substantiated by the investigators. As such, Potomac argues that the evidence was more prejudicial than probative and only served to confuse the jury. Alternatively, Potomac argues that the reports constituted Rule 404(b) evidence— evidence of prior bad acts that plaintiffs sought to use to convince the jury that staff members acted in conformity therewith by abusing the plaintiffs—and that the circuit court erred by not holding an in-camera hearing to determine their admissibility as required by *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994).

> In considering Potomac's arguments, we begin by recognizing that,
>
>> The West Virginia Rules of Evidence . . . allocate significant discretion to the trial court in making evidentiary . . . rulings. Thus, rulings on the admission of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary . . . rulings of the circuit court under an abuse of discretion standard." Syl. Pt. 1, in part, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995).

Syl. Pt. 9, *Tudor v. Charleston Area Med. Ctr., Inc.,* 203 W. Va. 111, 506 S.E.2d 554 (1997). Regarding whether evidence is relevant, Rule 401 of the West Virginia Rules of

23

Evidence provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Not all relevant evidence is admissible though. "Rules 402[14] and 403[15] . . . direct the trial judge to admit relevant evidence, but to exclude any evidence the probative value of which is substantially outweighed by the danger of unfair prejudice to the defendant." *Gable v. Kroger Co.,* 186 W. Va. 62, 66, 410 S.E.2d 701, 705 (1991). Stated another way,

> Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the [exhibit] is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the

---

[14] Rule 402 of the West Virginia Rules of Evidence provides:

> Relevant evidence is admissible unless any of the following provides otherwise:
> (a) the United States Constitution;
> (b) the West Virginia Constitution;
> (c) these rules; or
> (d) other rules adopted by the Supreme Court of Appeals of West Virginia.
> Irrelevant evidence is not admissible.

[15] Rule 403 of the West Virginia Rules of Evidence provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

> trial court's discretion will not be overturned absent a showing of clear abuse.

Syl. Pt. 10, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994). Notably,

> [a]lthough Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence.

*Derr*, 192 W. Va. at 167, 451 S.E.2d at 733, syl. pt. 9.

Upon review, we find that certain instances of misconduct by Potomac staff employees directed toward children other than the plaintiffs would be relevant to the plaintiffs' claim that they were subjected to a hostile environment while they resided at the facility in violation of the Human Rights Act. However, to be relevant, that conduct, at the very least, would have had to have occurred while the plaintiffs resided at the facility, and the incidents would have had to have been substantiated by the investigators. Unsubstantiated allegations of mistreatment of other children cannot serve as proof that the plaintiffs were subjected to a hostile environment based on their disabilities. Yet, the investigative reports at issue are replete with such allegations. Indeed, the reports appear to contain summaries of interviews of all Potomac staff members. Most staff members denied directly witnessing any abuse of the children. However, many acknowledged that they had heard rumors about particular instances of abuse or said that they were told by

25

another staff member about a specific incident.[16]  For the most part, it is impossible to tell when much of this alleged misconduct occurred, and, importantly, there is nothing in the reports indicating that either L.K. or D.S. were present when these events happened.

Even if certain portions of these investigative reports were relevant to the plaintiffs' claims, the submission of the investigative reports in their entirety clearly violated Rule 403.   In conducting the Rule 403 balancing test, certain factors should be considered.  As this Court has explained,

> [a]lthough there is no universal agreement among jurists regarding the factors to be considered by a trial court in conducting its balancing under Rule 403, there is some consensus that the following factors are at least relevant: (a) the need for the evidence, (b) the reliability and probative force of the evidence, (c) the likelihood that the evidence will be misused because of its inflammatory effect, (d) the effectiveness of limiting instructions, (e) the availability of other forms of proof, (f) the extent to which admission of evidence will require trial within trial, and (g) the remoteness and similarity of the proffered evidence[.]

*McGinnis,* 193 W. Va. at 156 n.11, 455 S.E.2d at 525 n.11.   Here, the reliability and probative force of the evidence as well as the likelihood that the evidence was misused because of its inflammatory effect require us to find that the circuit court abused its discretion in its Rule 403 determination.   Given the vast quantity of unsubstantiated

---

[16] For instance, in the "IIU-Long Report," Ms. Glover related that one employee stated: "He has heard a lot of rumors about kids being abused.  He heard about a screwdriver in someone's hair and something about a shower."  Another employee said, "She has heard rumors of abuse of (name redacted) such as rags thrown in the face and being held down in the shower."

26

allegations and the graphic and scandalous nature of some of the accusations,[17] the chance that the evidence was misused by the jury is virtually certain. Undoubtedly, the jury was confused by the information in the reports given that for many of the alleged improper acts, the victim(s), the perpetrator(s), and the time the incident(s) occurred were not identified.

Even if Rules 401 and 403 were satisfied here, the reports contain a substantial amount of hearsay, some of which was clearly inadmissible. Under Rule 802 of the Rules of Evidence, hearsay is not admissible unless one of the exceptions set forth in the rules applies. Here, no effort was made to identify and redact the inadmissible hearsay contained within the reports. Instead, the circuit court concluded that the investigative reports constituted business records under Rule 803(6),[18] and therefore were admissible in their entirety. However, this Court has held that,

---

[17] The reports contain many allegations that certain staff members engaged in sexual activity with each other during work hours. For example, in the "IIU-Long Report," Ms. Glover relayed that a staff member "recalled that when she moved to the main campus she was told to be careful because her desk was used to have sex on. She noted that the staff that told her was gone long ago . . . She heard rumors that it has started up again but she was not sure about it."

[18] Rule 803(6) of the West Virginia Rules of Evidence provides that the following is not excluded by the hearsay rule:

> Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

27

> Before evidence may be admitted under W. Va. R. Evid.
> 803(6), the proponent must demonstrate that such evidence is
> (1) a memorandum, report, record, or data compilation, in any
> form; (2) concerning acts, events, conditions, opinions or
> diagnoses; (3) made at or near the time of the matters set forth;
> (4) by, or from information transmitted by, a person with
> knowledge of those matters; (5) that the record was kept in the
> course of a regularly conducted activity; and (6) that it was
> made by the regularly conducted activity as a regular practice.

Syl. Pt. 7, *Lacy v. CSX Transp. Inc.,* 205 W. Va. 630, 520 S.E.2d 418 (1999), *superseded by rule on other grounds as stated in Miller v. Allman*, 240 W. Va. 438, 813 S.E.2d 91 (2018).  As discussed above, there is nothing to indicate when many of the alleged acts of misconduct and mistreatment of other children at Potomac occurred.  Consequently, it cannot be concluded that the reports were "made at or near the time" of the matters set forth therein.  Furthermore, it cannot be established that the information was transmitted by a person of knowledge as many of the alleged improper acts were relayed to the investigators by Potomac employees as rumors.[19]  Accordingly, the investigative reports do not come within the business records exception.

---

> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the
> custodian or another qualified witness, or by a certification that
> complies with Rule 902(11) or (12) or with a statute permitting
> certification; and
> (E) neither the source of information nor the method or
> circumstances of preparation indicate a lack of trustworthiness.

[19] *See* note 16, *supra*.

The circuit court's alternative basis for admitting the records was the public records exception provided in Rule 803(8).[20] However, this rule requires the record to set out "a matter observed under a legal duty to report," and some of the accounts of misconduct contained within the reports came from the children and their parents who have no such duty. W. Va. R. Evid. 803(8). Furthermore, this exception requires that "neither the source of information nor other circumstances indicate a lack of trustworthiness." *Id.* Given that the reports are full of rumors and unsubstantiated allegations of abuse, this provision cannot be satisfied either.

Based on all of the above, we find that the circuit court erred by admitting the investigative reports into evidence at trial without any redaction of the inadmissible evidence clearly contained therein. While certain portions of the investigative reports may be relevant to the plaintiffs' claims, the admission of these reports in their entirety was

---

[20] Rule 803(8) of the West Virginia Rules of Evidence provides that public records are not excluded by the hearsay rule:

> Public Records. A record or statement of a public office if:
> (A) it sets out:
>     (i) the office's activities;
>     (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>     (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> (B) neither the source of information nor other circumstances indicate a lack of trustworthiness.

clearly more prejudicial than probative and only served to confuse the issues and mislead the jury.[21]

Having found that the admission of the investigative reports in their entirety was error, we now must determine whether a new trial is warranted. Under Rule 61 of the West Virginia Rules of Civil Procedure, "[n]o error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice." Accordingly, this Court has declared that courts should not grant a new trial unless "'it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.'" *In re State Public Bldg. Asbestos Litigation*, 193 W. Va. 119, 124, 454 S.E.2d 413, 418 (1994), *quoting* 11 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2803 at 32-33 (1973) (footnotes omitted). While the standard for granting a new trial is high, we find that it has been met here.

---

[21] Because we have found that the admission of the investigative reports in their entirety was error on relevancy, unfair prejudice, and hearsay grounds, we need not address Potomac's alternative argument under Rule 404(b). However, given the nature of the evidence at issue, Rule 404(b) would necessarily be a part of the circuit court's analysis should the plaintiffs seek to admit any portion of these investigative reports upon retrial of this matter. *See McGinnis,* 193 W. Va. at 151, 455 S.E.2d at 520, syl. pt. 2 (holding that where evidence is offered pursuant to Rule 404(b), the trial court must hold a hearing to consider its admissibility).

After carefully reviewing all the evidence admitted at trial including the investigative reports at issue, we are convinced that prejudicial error crept into the record. The admission of these reports resulted in a trial where the focus was on the alleged misconduct that was directed toward children other than L.K. and D.S. and the laws and regulations that Potomac and its staff members violated as a result. The admission of this evidence was highly prejudicial to Potomac because it permitted the jury to infer that L.K. and D.S. has been subjected to the same misconduct even though there was no evidence that they were present when these alleged acts occurred. While the circuit court gave the jury a limiting instruction,[22] we do not find that it cured the error given that in most instances, the accounts of abuse in the reports fail to identify the victim(s), the abuser(s), or when the misconduct occurred.

We are also troubled by the fact that while the plaintiffs were permitted to present to the jury these investigative reports that were hundreds of pages in length and appear to contain every allegation and rumor of misconduct occurring at Potomac over the course of many years, Potomac was severely limited in the evidence it could present in opposition. In that regard, prior to trial, the circuit court ruled that (1) "Defense Counsel

---

[22] The jury was instructed:

> You the jury are hereby advised that the fact that children other than L.K. and D.S. were subjected to abuse at the Potomac Center is not evidence that L.K. and D.S. were abused.

would not be permitted to probe into details of underlying civil abuse and neglect cases regarding the Plaintiffs and protective services records concerning the same;" (2) that "there be no testimony concerning the fitness or medical conditions of the Plaintiffs' parents;" and (3) that the court "would not permit introduction of evidence, documents, and/or orders from any underlying abuse and neglect case [and] that the [c]ourt would not permit release of details of abuse suffered by the Plaintiffs prior to admission to the Potomac Center." The circuit court only permitted "evidence concerning the Plaintiffs' baseline for treatment and diagnoses at the time of admission to the Potomac Center, to include that the children were abused."[23] The net effect of these rulings was that Potomac could put forth very little evidence to support its theory that the plaintiffs' psychological conditions were not the result of abuse they allegedly suffered at Potomac but rather were caused by the abuse they endured in their own family homes before they resided at the facility, and with regard to L.K. afterwards as well.[24]

Because of the erroneous admission of the investigative reports and the disparity in the evidence that was allowed to be presented to the jury, we cannot conclude that substantial justice was done in this matter. The plaintiffs were allowed to present copious amounts of irrelevant and highly prejudicial evidence to the jury. Yet, relevant

---

[23] These pretrial rulings were recounted in the circuit court's April 1, 2022, final order denying Potomac's motion for a new trial.

[24] There was evidence indicating that L.K. may have been abused by a family member after she was released from Potomac.

evidence that Potomac wished to present was excluded. We have made clear that "the trial court has an obligation to all parties to ensure that the trial is conducted in a fair manner." Syl. Pt. 3, in part, *State v. Delorenzo*, 247 W. Va. 707, 885 S.E.2d 645 (2022). Here, the circuit court failed in its gatekeeping function by allowing the admission of irrelevant and highly prejudicial evidence that plaintiffs wished to present and barring much of the relevant evidence sought to be used by Potomac.[25]

> "Ordinarily, when a circuit court is afforded discretion in making a decision, this Court accords great deference to the lower court's determination. However, when we find that the lower court has abused its discretion, we will not hesitate to right the wrong that has been committed." *Rollyson v. Jordan*, 205 W.Va. 368, 379, 518 S.E.2d 372, 383 (1999). *Accord*, *Gribben v. Kirk*, 195 W.Va. 488, 500, 466 S.E.2d 147, 159 (1995). Or in other words: "We grant trial court judges wide latitude in conducting the business of their courts. However, this authority does not go unchecked, and a judge may not abuse the discretion granted him or her under our law." *Lipscomb v. Tucker County Com'n.*, 206 W. Va. 627, 630, 527 S.E.2d 171, 174 (1999).

*Foster v. Sakhai,* 210 W. Va. 716, 722, 559 S.E.2d 53, 59 (2001). For the foregoing reasons, we find that the circuit court abused its discretion in denying Potomac's motion for a new trial.[26]

---

[25] To be clear, we take no position on the admissibility of any previously excluded evidence that Potomac may seek to admit when this case is retried. Any evidence that any party seeks to admit upon retrial would be subject to analysis under Rules 401, 402, 403, and any other applicable rule by the circuit court in the first instance.

[26] Having determined that a new trial is necessary because of the improper admission of the investigative reports in their entirety, we do not address the other evidentiary issues asserted by Potomac. *See Murphy v. Miller*, 222 W. Va. 709, 721 n. 13, 671 S.E.2d 714, 727 n. 13 (2008) (declining to address testimonial issues regarding experts

## IV. Conclusion

Accordingly, the April 1, 2022, order of the Circuit Court of Hardy County is reversed, and this case is remanded for a new trial.

Reversed and remanded.

---

because of court's decision to remand on other grounds); *Phares v. Brooks,* 214 W. Va. 442, 447 n.5, 590 S.E.2d 370, 375 n.5 (2003) (not addressing other assignments of error because juror's failure to answer material *voir dire* question required new trial); *see also* note 12, *supra*.